**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **M. MAZEN ALKHATIB,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 10-00342-KD-C** |
| | ) | |
| **JOHN W. STEADMAN,** *et al.*, | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 29) and Plaintiff's Motion To Strike (Doc. 36).  Upon consideration of the parties' briefs and evidentiary submissions  (Docs. 29-2 to 29-16, 30, 31, 33, 34, 34-1 to 34-3, 35, 35-1 to 35-2, and 39), Defendants' motion is due to be **GRANTED**, and Plaintiff's motion is due to be **DENIED**.

**I.      Procedural History**

On July 7, 2010, Plaintiff M. Mazen Alkhatib ("Alkhatib") commenced this action by filing a complaint against John W. Steadman ("Steadman") and the Trustees of the University of South Alabama (the "Trustees" and "USA," respectively) (collectively, "Defendants") alleging that the Defendants discriminated against him and denied him equal protection of the law because of his race, ancestry, and ethnicity.  (Doc. 1).  Steadman, who was sued in both his individual capacity and his official capacity as Dean of USA's College of Engineering, answered the complaint on October 21, 2010.  (Doc. 13).  The Trustees separately answered on the same day.  (Doc. 14).  On September 26, 2011, after the close of discovery, Defendants moved for summary judgment as to all claims. (Doc. 29).  Plaintiff's response (Doc. 33) and Defendants' reply (Doc. 35) were timely filed, and the motion is now ripe for consideration.

## II.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) governs procedures and provides as follows:

**(1)** ***Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A)    citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)    showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

**(2)** ***Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

**(3)** ***Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

**(4)** ***Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Defendants, as the parties seeking summary judgment, bear the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The mere existence of a factual dispute will not automatically

necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004).

If the non-moving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving parties are entitled to summary judgment. Celotex, 477 U.S. at 323. In reviewing whether the non-moving party has met his burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

## III.   Factual Background

Alkhatib is an Alabama resident who was employed by USA as a professor in the Electrical and Computer Engineering Department of the College of Engineering from 1999 to 2008. (Doc. 29-3 at 10, 48, & 107). He describes his race as white, his ancestry as Syrian, and his ethnicity as "Middle Eastern with European origin." (Id. at 8-9). Steadman is and was, at all times relevant to this lawsuit, the Dean of USA's College of Engineering. (Doc. 13 at 2, ¶ 5; Doc. 29-5 at 6). Defendants Joseph Morton, Christie Miree, John M. Peek, Dr. Stephen P. Furr, Bettye R. Maye, Bryant Mixon, Dr. Scott A. Charlton, Larry D. Striplin, Jr., J. Cecil Gardner, Samuel L. Jones, Arlene Mitchell, Dr. Stephen H. Stokes, Judge Kenneth O. Simon, and James A. Yance are Trustees of USA. (Doc. 1 at 3, ¶ 6; Doc. 14 at 2, ¶ 6). Defendants Bob Riley, James P. Nix, and Donald L. Langham are former USA Trustees. (Doc. 30 at 17; Doc. 29-2).

Alkhatib began working for USA during the 1999-2000 academic year as a visiting assistant professor. (Doc. 29-3 at 10). USA extended Alkhatib's appointment for a second year before

selecting him for a tenure-track position in August 2001. (Id. at 11). Alkhatib subsequently applied for tenure, (id.), and Steadman, in his capacity as Dean of Engineering, recommended that Alkhatib's application be granted. (Id. at 96-97). On August 15, 2007, Alkhatib became a tenured associate professor at USA. (Id. at 98). In the years preceding his tenure, Alkhatib received multiple salary increases, which Steadman approved personally. (Id. at 17-18 & 92-95).

In or about late 2007 or early 2008, Alkhatib began to feel that he was being discriminated against at USA and by Steadman. (Id. at 14). On one such occasion, Alkhatib was discouraged by an assistant dean of the College of Engineering from presenting certain projects at "E-Day," a student recruitment event. (Id. at 14-15). More specifically, the assistant dean criticized Alkhatib for not being fully prepared to present his projects as E-Day approached. (Id. at 15). Alkhatib complained to Steadman that the assistant dean's criticism was "aggressive" and "inappropriate," and he wanted Steadman to force the assistant dean to apologize. (Id.). Steadman did not demand an apology from the assistant dean. Rather, Steadman told Alkhatib that his projects were "too complicated" to be included in E-Day, and he encouraged a different faculty member to present. (Id. at 15-16). Undeterred, Alkhatib did present at E-Day. (Id. at 15).

Sometime later, in March or April 2008, Alkhatib was ill and missed a number of scheduled lectures without arranging for backup coverage. (Id. at 3). Steadman remarked to Alkhatib that, in Steadman's opinion, Alkhatib had "cheated the students." (Id.). Alkhatib believes Steadman's comment was "inappropriate" and "very harsh" and that Steadman should have apologized for it. (Id. at 3 & 17). Steadman did not apologize. (Id. at 3 & 20).

Though Alkhatib felt "very humiliated" by Steadman's comment (id. at 3) — which Alkhatib claims caused him "very mental damage" (id. at 20) — he did not complain about Steadman to USA's administration. Instead, Alkhatib and another professor spoke to two members of the faculty

4

senate who advised Alkhatib to "try to keep . . . a low profile," "[w]ait a little bit," and reassess the situation after his students evaluated him at the end of the term.  (Id. at 3).  The record does not reflect that Alkhatib ever suggested to the two faculty senate members that Steadman demonstrated any sort of discriminatory bias against him.  As Alkhatib admits, Steadman never made any derogatory comments to him concerning his race, ancestry, or ethnicity.  (Id. at 57).[1]

On July 6, 2008, Alkhatib spoke to Dr. Mohammad S. Alam ("Alam"), the Chair of the Electrical and Computer Engineering Department and Alkhatib's direct supervisor, concerning a family health issue overseas.  (Doc. 29-3 at 6; Doc. 31 at 4, ¶ 11; Doc. 33 at 3, ¶ 6).  Specifically, Alkhatib wanted to be with his father in Syria, who he learned was very sick and who he expected to die within six months.  (Doc. 29-3 at 22 & 25).  The same day, Alkhatib sent an email to Steadman, which stated his desire to apply for a "1 year leave with no pay."  (Id. at 100).  Pursuant to USA policy, unpaid leaves of absence could be granted for a period of one year or less and extended for an additional period not to exceed two years if such leave and extensions were cleared by the appropriate department chair, cleared by the appropriate dean, approved by USA's Senior Vice

---

[1]    USA's Faculty Handbook sets forth the complaint procedures available to faculty members who believe that they or others have been subjected to discrimination based on race, color, gender, age, religion, national origin, disability, or veteran status.  (Doc. 29-3 at 75).  The October 2007 version of the Faculty Handbook specified that a person could proceed with his or her complaint formally or informally.  (Id. at 75-78).  Formal complaints against a fellow faculty member were to be filed with USA's Affirmative Action Officer for Faculty and Administration, who would investigate the complaint; demand a written response from the accused; meet with the complainant and the accused either separately or together; and appoint a fact-finding committee composed of faculty members, administrators, and a staff member that would receive evidence, question witnesses, and prepare findings of fact and recommendations for a senior administrator.  (Id. at 76-78).  Informal complaints could be brought to the attention of a department chair, dean, supervisor, or the Affirmative Action Officer, who would counsel the complainant as to the options available under USA's Equal Opportunity and Affirmative Action Policy; assist the complainant in resolving his or her complaint informally; and/or assist the complainant in drafting a formal complaint.  (Id. at 75-76).  Alkhatib received and read the Faculty Handbook, (id. at 13), but he never complained about Steadman — formally or informally — to any of the individuals named in USA's policy.  (Id. at 46-47).

President for Academic Affairs or Vice President for Health Sciences, and approved by USA's President.  (<u>Id.</u> at 91).  In his July 6, 2008 email, Alkhatib sought Steadman's guidance as to how to proceed with making a formal request for unpaid leave.  (<u>Id.</u> at 100).  The next afternoon, on July 7, 2008, Alkhatib sent a similar email to Alam.  (<u>Id.</u> at 101).  Nearly twelve hours later, Alkhatib sent Alam another email and attached an unsigned letter that expressed his need to be close to his father and sought a leave of absence without pay to begin on August 15, 2008 and end May 15, 2009.  (<u>Id.</u> at 102-03).

On July 8, 2008, Alkhatib, Alam, and Steadman met for nearly an hour to discuss Alkhatib's request, which, by then, Alkhatib had set forth in a signed version of the letter he had emailed to Alam the night before.  (<u>Id.</u> at 104; Doc. 29-4 at 8; Doc. 34-2 at 4).  Steadman and Alam both cautioned Alkhatib that a request for a year-long leave might not be approved.  In their respective tenures as Dean and department chair, neither man had ever received a request for a leave of such length.  (Doc. 29-4 at 7; Doc. 29-5 at 7).  Both Steadman and Alam were aware that, several years earlier, another foreign-born professor, Dr. Hyunchul Ko, had requested and taken a semester-long unpaid leave because his mother and sister in South Korea were diagnosed with terminal cancer but that Dr. Ko's subsequent request for a one-semester extension — which, had it been granted, would have resulted in a one-year leave — was denied.  (Doc. 29-4 at 7; Doc. 29-5 at 9; Doc. 29-6 at 7).  Steadman explained to Alkhatib that unpaid leaves are discretionary and that the best interests of the University would be determinative.  (Doc. 29-5 at 8).  To that end, Steadman expressed that, at that time, there was a faculty shortage at USA.  (Doc. 29-3 at 24).  Steadman suggested that, instead of seeking an unpaid leave, Alkhatib consider taking up to 120 days of family medical leave.  (Doc. 29-5 at 8; Doc. 29-3 at 23).  Steadman told Alkhatib that he thought a request for family medical leave would be approved, provided that Alkhatib could document his father's condition.  (Doc. 29-5 at 8-

9; Doc. 29-3 at 23).  Alkhatib spoke with his father about getting the necessary documentation, but Alkhatib's father responded that he did not have any medical reports and did not want to cooperate. (Doc. 29-3 at 6).  In any event, because Alkhatib believed that a few months of family medical leave would not meet his need (id. at 26), and because he interpreted Steadman's advice during the meeting to mean that a request for unpaid leave would not be approved (id. at 23-24 & 120; Doc. 30 at 5; Doc. 33 at 4), Alkhatib told Steadman and Alam that he thought his only option was to resign from USA.  (Doc. 29-3 at 23; Doc. 29-4 at 8; Doc. 29-5 at 10).

After the meeting, Alam spoke with Alkhatib and told him to think carefully before deciding to resign.  (Doc. 29-4 at 10 & 14).  Alam repeatedly advised Alkhatib to talk to senior faculty members and to someone that Alkhatib trusted because "tenure is a big deal in the career of a faculty member."  (Id. at 10-11).  At the end of the conversation, Alam understood that Alkhatib was still considering his options, and, therefore, Alam did not forward Alkhatib's leave request to Steadman. (Id. at 10 & 14-15; Doc. 29-5 at 8-9).

The following day, on July 9, 2008, Alkhatib and Alam met again, and Alkhatib handed Alam a signed resignation letter.  (Doc. 29-3 at 105).  In pertinent part, the letter stated: "I would like to resign from my position of Tenured Associate Professor of Electrical and Computer Engineering effective July 30, 2008 due to unavoidable family circumstances."  (Id.).  Alam reviewed the letter and again counseled Alkhatib.  (Doc. 29-4 at 12).  Alam said that resigning "is a very, very serious decision in the career of a person," reminded Alkhatib that "[g]etting a tenured position is most extremely difficult," and urged Alkhatib to "think very, very carefully."  (Id.). Alam also told Alkhatib that "if he needs more time, to take that time" before tendering his resignation.  (Id.).  After Alkhatib refused Alam's offer of additional time, Alam contacted Steadman and informed Steadman of Alkhatib's decision.  (Id.).  Alam endorsed Alkhatib's resignation letter

with the notation "Accepted:  M. S. Alam 7/9/08" and gave a copy back to Alkhatib.  (Id. at 12-13;

Doc. 29-3 at 28 & 105).  Alam also had his secretary make a copy of the endorsed letter to give to

Steadman along with a request to hire temporary faculty to cover Alkhatib's classes.  (Doc. 29-4 at

12-13; Doc. 29-3 at 105-06).  The same day, Steadman forwarded Alkhatib's resignation letter and

Alam's request for temporary faculty to Dr. Carl Moore ("Moore"), USA's Senior Vice President for

Academic Affairs.  (Doc. 29-3 at 106).

Alam was responsible for replacing Alkhatib and filling other vacancies in the Electrical and

Computer Engineering Department.  (Doc. 29-4 at 15).  Relying on the recommendations of a search

committee that had been previously assembled, Alam wrote a series of memoranda addressed to

Steadman suggesting that USA hire Drs. John Tanik and Mutki Rana for one-year positions and hire

Dr. Nurhidajat Sisworahardjo for a one-semester position.  (Id. at 15-16; Doc. 29-3 at 108-13).  On

July 29, 2008, Steadman sent a memo to Moore concurring with Alam's recommendations.  (Doc.

29-3 at 114-15; Doc. 29-5 at 13).  At least two of the three men recommended by Alam and

Steadman were foreign-born and of non-white race.  (Doc. 29-4 at 15-16; Doc. 29-3 at 30-31).

While Alam, Steadman, and Moore were identifying, interviewing, recommending, and

selecting temporary faculty for the upcoming year, Alkhatib began to reconsider his decision to

resign — a decision that Alkhatib now believes he "should have considered more."  (Id. at 7 & 28).

On or about July 25, 2008 or July 26, 2008, Alkhatib spoke with someone in USA's human

resources office and asked how he might go about retracting his resignation.  (Id. at 28).  Alkhatib

also searched the internet and "found lots of examples" online of people who retracted their

resignations.  (Id.).  Alkhatib contacted Alam and told him that he was having "second thoughts"

about resigning.  (Doc. 29-4 at 12; Doc. 29-3 at 33).  Alam advised Alkhatib to consult the faculty

handbook.  (Doc. 29-4 at 12).  USA's Faculty Handbook does not address whether or how a

professor can withdraw his or her resignation once tendered.  (Id.; Doc. 29-4 at 13-14).[2]  Alam also

reached out to Steadman to tell him that Alkhatib was thinking about rescinding his resignation.

(Doc. 29-5 at 15).  In response, Steadman thought it would be appropriate to send Alkhatib a letter

making clear that Alkhatib's resignation was processed and "is a done thing."  (Doc. 29-5 at 15).  On

July 29, 2008, Steadman sent such a letter, which also expressed Steadman's sympathy that

Alkhatib's family medical concerns required him to make difficult career decisions.  (Doc. 29-3 at

116).  In the same letter, Steadman offered to provide Alkhatib with a letter of recommendation.

(Id.).

 Later that same day, from about 4:30 PM to 6:00 PM, Alkhatib met with Alam.  (Doc. 29-3

at 32-33).  During the meeting, Alkhatib handed Alam a signed letter that read in its entirety:

> Dear Dr. Alam,
>
> I am glad to inform you that my parents applied for a Visa to come to the US for possible health treatment.  Therefore, I am writing this letter to retract my resignation letter submitted on July 9, 2008 with an effective resignation date of July 30, 2008, and I would like to keep my current position as Tenured Associate Professor of Electrical and Computer Engineering.
>
> Based on the above, I am available for teaching and service from the Fall 2008 Semester.  I look forward to serve [sic] the Department of Electrical and Computer Engineering, College of Engineering, and the University of South Alabama.
>
> Best Regards,
> *[signed]*
> Dr. Mazen Al-Khatib
> Associate Professor of Electrical and Computer Engineering

(Id. at 117).  Alam brought Alkhatib's letter to Steadman the following morning.  (Doc. 29-4 at 18).

---

2    The pages of the Faculty Handbook that the parties have put before the Court contain only a
single sentence regarding resignation: "Faculty members are expected to give reasonable notice
before terminating employment."  (Doc. 29-3 at 85).  Though Alkhatib apparently attempted to
retract his resignation just two weeks before the start of the academic year (Doc. 29-4 at 7), no party
has suggested that Alkhatib failed to give reasonable notice of his decision to terminate his
employment with USA.

Steadman told Alam that Alkhatib could not retract his resignation.  (Id. at 18-19; Doc. 30 at 10 n.14).  Alam informed Alkhatib about his conversation with Steadman.  (Doc. 29-4 at 19).  Alkhatib then requested a meeting with Steadman, but Steadman was unavailable and going out of town.  (Doc. 29-3 at 35).

Alkhatib met with Steadman early in the morning on August 7, 2008, once Steadman was back on campus.  (Id. at 36 & 119-20).  Alkhatib begged Steadman for help; he told Steadman that he was wrong to have resigned, that he was under stress, that Syria is a bad place, and that he wanted to stay at USA.  (Id. at 36).  Steadman told Alkhatib that there was no longer any money in his position and that resignations cannot be withdrawn.  (Id.).  Alkhatib thought Steadman was emotionless and "too tough."  (Id.).

Later that day, Alkhatib met with Moore, who, at that time, was both Interim Senior Vice President for Academic Affairs and USA's Affirmative Action Officer for Faculty and Administration.  (Id. at 37-39 & 120; Doc 35-1 at 2-3, ¶¶ 2-3).  During his meeting with Moore, Alkhatib was upset, but he did not say anything that indicated to Moore that he believed he was being discriminated against on any basis by Steadman or anyone else.  (Doc. 35-1 at 3-4, ¶ 8).  Moore told Alkhatib that nothing could be done about Alkhatib's status for the approaching academic year, but he suggested that Alkhatib apply for an open position if and when one was advertised.  (Id. at 3, ¶ 4; Doc. 29-3 at 38-39).

Although Alkhatib thought Moore's proposal was "the good way to deal" with his predicament (Doc. 29-3 at 38-39), he sought the advice of Jean Tucker ("Tucker"), Senior University Attorney at USA, four days later.  (Id. at 120).  In his email to Tucker, Alkhatib recounted the events of the previous two months: the July 6 meeting with Alam and subsequent conference with both Alam and Steadman, the July 9 resignation letter, the July 29 retraction letter,

and the August 7 meetings with Steadman and Moore.  (Id.).  Nowhere in the email did Alkhatib

state or imply that he had been discriminated against on any basis or that his race, ancestry, or

ethnicity had motivated any of Alam's, Steadman's, or Moore's decisions that are at issue in this

case.  (Id.).[3]

## IV.    Analysis

Before turning to its summary judgment analysis, the Court will first address Alkhatib's

motion to strike certain evidence that Defendants submitted with their reply brief.

### A.      Plaintiff's Motion to Strike (Doc. 36)

Alkhatib argues that two exhibits attached to Defendants' reply brief, namely an affidavit

signed by Dr. Moore (Doc. 35-1) and excerpts from Dr. Alam's deposition (Doc. 35-2), should be

stricken because 1) they should have been submitted with Defendants' moving papers; 2) they

contain information not disclosed in Defendants' moving brief; and 3) the Court ordered the

Defendants to file a reply brief without explicitly ordering further evidentiary submissions.

Alkhatib's arguments are meritless.

As a matter of course, the Court will accept and consider evidentiary materials submitted in

support of a movant's reply arguments where, as here, those arguments and supporting materials are

related and responsive to the non-movant's opposition brief and do not support new grounds for

relief.  See Hammons v. Computer Programs & Sys., Inc. (CPSI), No. 05-0613-WS-C, 2006 WL

3627117, at *14 (S.D. Ala. Dec. 12, 2006) ("[N]othing in the extant authorities, or in the Federal

---

[3]    Neither Alam nor Moore is a defendant in this case.  The complaint alleges that Steadman
discriminated against Alkhatib and that the Trustees "ratified the actions of Steadman in not
allowing Alkhatib to withdraw his resignation."  (Doc. 1 at 5, ¶ 26).  Alkhatib has offered no other
allegations or arguments with respect to any decisions made by the Trustees.  Accordingly, the only
possible liability of the Trustees would be based on respondeat superior liability for the actions of
Steadman.  However, "[Section] 1983 does not provide for liability under a theory of respondeat
superior."  Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010).

Rules of Civil Procedure, forbids a movant from making supplemental record submissions in a reply brief to rebut specific arguments raised by the non-movant's opposition brief."); see also Baugh v. City of Milwaukee, 823 F. Supp. 1452, 1456 (E.D. Wis. 1993) ("It seems absurd to say that reply briefs are allowed but that a party is proscribed from backing up its arguments in reply with the necessary evidentiary material."), aff'd, 41 F.3d 1510 (7th Cir. 1994).

Accordingly, Plaintiff's Motion To Strike Evidentiary Submissions in Defendants' Reply Brief (Doc. 36) is **DENIED**.[4]

B.     Defendants' Motion for Summary Judgment (Doc. 29)

Alkhatib's complaint asserts two causes of action against Defendants: 1) a claim for discrimination in violation of 42 U.S.C. § 1981; and 2) a claim for disparate treatment in violation of the Equal Protection Clause of the Fourteenth Amendment.   (Doc. 1 at 6, ¶ 30; id. at 7, ¶ 35). Section 1981 protects an individual's right to be free from racial discrimination in the "making, performance, modification, enforcement, and termination" of contracts.   See, e.g., Selby v. Tyco Healthcare Group, L.P., 301 F. App'x 908, 910 (11th Cir. 2008) (quoting 42 U.S.C. § 1981 (2006)). The Equal Protection Clause states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."   U.S. Const. amend. XIV, § 1.[5]

---

[4]   Alkhatib's objection to Doc. 35-2 is curious at best, inasmuch as Alkhatib himself previously offered as an exhibit to his opposition brief the same documents that Defendants attached to their reply brief.  Compare Doc. 34-3 at 24-25 (pages 93-100 of Dr. Alam's deposition transcript) with Doc. 35-2 at 3 (pages 94-97 of the same transcript).

[5]   In accordance with Eleventh Circuit precedent, see Butts v. Cnty. of Volusia, 222 F.3d 891, 894 (11th Cir. 2000), Alkhatib brought his § 1981 claim via 42 U.S.C. § 1983.  (Doc. 1 at 6, ¶ 29). However, with respect to his constitutional claim, Alkhatib failed to follow this required procedure. As this Court has observed previously, the Fourteenth Amendment, by itself, does not create a direct cause of action.  See Lee v. City of Marion, Ala., No. 2:09-0301-KD-N, 2010 WL 2104181, at *7 n.9 (S.D. Ala. May 25, 2010).  Rather, "[a] § 1983 action is the proper vehicle for a plaintiff to bring a federal claim against a state actor for violation of a constitutional right."  Cornelius v. City of Andalusia, No. 2:06-CV-00312-WKW, 2007 WL 4224036, at *3 (M.D. Ala. Nov. 28, 2007); see

"[A] plaintiff must prove intentional discrimination to establish a disparate treatment claim under § 1981, § 1983 and the fourteenth amendment." Richardson v. Lamar Cnty. Bd. of Educ., 729 F. Supp. 806, 808 n.3 (M.D. Ala. 1990) (citing Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir. 1985)), aff'd, 935 F.2d 1240 (11th Cir. 1991).   Intentional discrimination can be proved through direct evidence, circumstantial evidence, or statistical proof.  Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1274 (11th Cir. 2008).   "Direct evidence of discrimination is 'evidence that, if believed, proves the existence of a fact without inference or presumption.'" Dixon v. Hallmark Cos., 627 F.3d 849, 854 (11th Cir. 2010) (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004)).   "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." Id. (quoting Wilson, 376 F.3d at 1086).  Whereas Alkhatib has not presented any direct or statistical evidence of discrimination, he must rely on circumstantial evidence to prove his claims.

The Eleventh Circuit recently set forth the two ways that a plaintiff can prove a claim of discrimination through circumstantial evidence: "under the three-step, burden-shifting framework established by the Supreme Court in McDonnell-Douglas Corp. v. Green . . . or, alternatively, by presenting circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Edmond v. Univ. of Miami, No. 10-15742, 2011 WL 4495638, at *1 (11th Cir. Sept. 29, 2011).  The availability of two separate approaches need not detain us long, for no matter which path is taken here, Alkhatib's claims ultimately fail.

---

also McGinley v. Fla. Dep't of Highway Safety & Motor Vehicles, No. 10-15240, 2011 WL 3428128, at *1 (11th Cir. Aug. 8, 2011) ("Section 1983 allows claims against any person who, acting under color of state law, deprives another of a constitutional or federal statutory right."). Despite Plaintiff's pleading error, the Court will proceed to the merits of Alkhatib's constitutional claim as if it had been alleged properly by way of § 1983.

1.      McDonnell-Douglas burden-shifting

Under the McDonnell Douglas approach, if Alkhatib can establish a prima facie case of

discrimination, the burden of production shifts to Defendants to articulate at least one legitimate,

non-discriminatory reason for their challenged employment decisions.[6]  See McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 802 (1973).  If Defendants provide such justification, the burden shifts

back to Alkhatib to show that each of Defendants' proffered reasons was pretextual.  Crawford v.

City of Fairburn, Ga., 482 F.3d 1305, 1308 (11th Cir. 2007).  To establish a prima facie case of

discrimination, Alkhatib must show he was 1) a member of a protected class and 2) subjected to an

adverse employment action in contrast with similarly situated employees outside the protected class.

Wilson, 376 F.3d at 1087 (citations omitted).  Alkhatib and his comparators must be similarly

situated "in all relevant respects."  Id. at 1092 (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th

Cir. 1997)).

The parties do not appear to dispute that Alkhatib is a member of a protected class.  Instead,

Defendants devote several pages of their briefs to the argument that the denial of a leave of absence

request and the refusal to allow a former employee to retract a voluntary resignation are not "adverse

---

[6]      As Alkhatib's attorney helpfully summarized during Alkhatib's deposition, "this case – it's about
not accepting [Alkhatib's] one-year leave and then not allowing him to rescind his resignation.
That's what this case is about."  (Doc. 29-3 at 46).  See also Doc. 1 at 6, ¶ 30 ("Plaintiff was
discriminated against . . . in the terms, conditions, and privileges of his employment, including but
not limited to refusing to grant him a leave of absence and to withdraw his resignation."); id. at 7,
¶ 35 ("Plaintiff was treated differently . . . in the terms, conditions, and privileges of employment,
including but not limited to refusing to grant him a leave of absence and to withdrawal [sic] his
resignation.").  Yet the issues can be narrowed even further.  Because Alkhatib's July 9, 2008
resignation short circuited any action on his July 7, 2008 leave request by Steadman or anyone else
at USA, Alkhatib cannot use USA's failure to grant that request as a basis for his discrimination
claims.  See Doc. 29-4 at 15 (Alam's testimony that he told Alkhatib that he would forward
Alkhatib's leave request to the dean with his recommendation, "[b]ut his decision was to resign").
Accordingly, the only employment decision before the Court that warrants any scrutiny is the
decision not to allow Alkhatib to rescind his resignation.

employment actions." (Doc. 30 at 19-21; Doc. 35 at 3). Though the Court finds persuasive the nearly one-dozen out-of-district and out-of-circuit cases the Defendants cite in support of that proposition,[7] the Court need not reach the question, because Alkhatib's failure to identify any comparators is, by itself, fatal to his prima facie case. See Edmonds, 2011 WL 4495638, at *2

---

[7]   See, e.g., Williams v. N.Y.C. Hous. Auth., 335 F. App'x 108, 110 (2d Cir. 2009) (denial of request for leave of absence does not constitute adverse employment action); Hammonds v. Hyundai Motor Mfg. Ala., LLC, No. 2:10-cv-103-TFM, 2011 WL 2580168, at *4 & n.8 (M.D. Ala. June 28, 2011) (joining with the Third, Sixth, and Seventh Circuits in holding that refusal to allow rescission of a voluntary resignation is not an adverse employment action); Ramey v. Potomac Elec. Power Co., 468 F. Supp. 2d 51, 56 n.5 (D.D.C. 2006) (denial of leave request is not an actionable adverse employment action because there is no tangible change in duties or working conditions); Rutledge v. SunTrust Bank, No. 8:05-CV-536-T27TGW, 2007 WL 604966, at *7 (M.D. Fla. Feb. 22, 2007) (refusal to allow plaintiff to rescind resignation is not an adverse employment action), aff'd per curiam, 262 F. App'x 956 (11th Cir. 2008). Alkhatib has not attempted to distinguish these cases or the others cited in Defendants' briefs. Instead, Alkhatib argues that he was constructively discharged from USA because he was "essentially forced . . . to resign in order to care for his dying father." (Doc. 33 at 13). Though "[c]onstructive discharge qualifies as an adverse employment decision," Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 n.2 (11th Cir. 1997), the Court finds that there are no facts to support a claim that Alkhatib was constructively discharged.

To successfully claim constructive discharge, Alkhatib must demonstrate that his working conditions were "so intolerable that a reasonable person in [his] position would have been compelled to resign." Id. at 553 (citation and quotation marks omitted). The record reflects neither that Alkhatib's work conditions were intolerable nor that his resignation was anything other than voluntary. As Defendants correctly note, Alkhatib's efforts to stay at USA undermine his intolerable conditions argument. See Hammonds, 2011 WL 2580168, at *4 (plaintiff's efforts to rescind resignation and maintain her employment established that working conditions were not intolerable); accord Trinidad v. N.Y.C. Dep't of Corr., 423 F. Supp. 2d 151, 168 (S.D.N.Y. 2006). Additionally, it is clear that Alkhatib was not forced to resign. Indeed, when Alkhatib first mentioned the prospect of his resignation on July 8, 2008, Alam urged him to "think carefully" before making any decisions. (Doc. 29-4 at 10 & 14). Even after Alkhatib tendered his signed resignation letter the next day, Alam encouraged him to take more time to consider his choices. (Id. at 12). But rather than applying for the family and medical leave that Steadman told Alkhatib would be approved (Doc. 29-5 at 8-9; Doc. 29-3 at 23), and rather than applying for a one-semester leave as another engineering professor had done when he wanted to be with immediate family members of his who had fallen ill abroad (Doc. 29-4 at 7; Doc. 29-5 at 9), Alkhatib resigned. In this Circuit, a resignation will be considered voluntary as long as the plaintiff had a choice; it is of no moment that the alternatives to resignation may be "unpleasant." See Hargray v. City of Hallandale, 57 F.3d 1560, 1568-69 (11th Cir. 1995). By now admitting that he "should have considered more" (Doc. 29-3 at 7), Alkhatib effectively concedes that his decision to resign, albeit hastily made, was voluntary.

(affirming grant of summary judgment where plaintiff "failed to identify an appropriate similarly situated individual"); <u>Abel v. Dubberly</u>, 210 F.3d 1334, 1339 (11th Cir. 2000) (affirming summary judgment for defendants where plaintiff could not show she was similarly situated to any other employee); <u>Brown v. Berg Spiral Pipe Corp.</u>, No. 10-237-CG-B, 2011 WL 3610646, at *14 (S.D. Ala. Aug. 17, 2011) (Granade, J.) (holding plaintiff's failure to identify any comparators fatal to his <u>prima</u> <u>facie</u> case of discrimination).

        2.      "Convincing mosaic"/inference of discrimination

As the Eleventh Circuit instructed earlier this year, "[e]stablishing the elements of the <u>McDonnell Douglas</u> framework is not, and never was intended to be, the <u>sine</u> <u>qua</u> <u>non</u> for a plaintiff to survive a summary judgment motion in an employment discrimination case." <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011).   Notwithstanding the absence of any comparative evidence, Alkhatib's discrimination claims may proceed to trial "if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" <u>Id.</u> (quoting <u>Silverman v. Bd. of Educ.</u>, 637 F.3d 729, 734 (7th Cir. 2011)).   Unfortunately for Alkhatib, the record he has produced in this case is more than a few tiles short of a mosaic, let alone a convincing one.

The only evidence with which Alkhatib has come forward to prove that Steadman was motivated by a discriminatory animus in refusing his effort to rescind his resignation is a compilation of anonymous remarks in a document entitled "2009/2010 Faculty Survey Results – Comments on Deans (edited)."   (Doc. 29-3 at 129-34).   Some of the remarks accuse Steadman of discriminating against foreign-born faculty members, but none of them explicitly reference or even appear to allude to Steadman's involvement with Alkhatib.   (<u>Id.</u> at 132).   Alkhatib does not know the

identities of the commenters or the circumstances that gave rise to their comments.  (Id. at 48).

Alkhatib also does not specifically recall how or from whom he obtained the survey results, though

he believes a former colleague of his who believed the criticism of Steadman would be "good for

[Alkhatib's] case" told him how to find the remarks online.[8]  (Id. at 47-48).

Defendants object on hearsay grounds to the Court's consideration of the survey results.

(Doc. 30 at 16 n.19).  Unquestionably, "inadmissible hearsay cannot be considered on a motion for

summary judgment."  Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation and

quotation marks omitted).  Alkhatib responds that the comments fit within an exception to the

hearsay rule because they are contained in "a university document used among other things in annual

reviews."  (Doc. 33 at 14 n.2).  Presumably, the exception that Alkhatib has in mind is the so-called

"business records" exception set forth by Rule 803(6) of the Federal Rules of Evidence.  As the

proponent of hearsay evidence, Alkhatib bears the burden of proving the applicability of an

exception, see, e.g., United States v. Kennard, 472 F.3d 851, 855-56 (11th Cir. 2006), but he has

failed to cite even a single case in support of his conclusory argument that anonymous and edited

responses to a survey are admissible.

The business records exception to the hearsay rule provides that records of regularly

conducted activity are admissible if the records' custodian or another qualified witness testifies that

the records 1) were prepared in the normal course of business; 2) were made at or near the time of

the events recorded; 3) were based on the personal knowledge of the entrant or of a person who had

a business duty to transmit the information to the entrant; and 4) are not otherwise untrustworthy.

Fed. R. Evid. 803(6).  The anonymous survey responses upon which Alkhatib chiefly relies meet

---

[8]    According to Alkhatib, he was alerted to these comments by Dr. Aed El-Saba, who, like
Alkhatib, is foreign-born and of Middle Eastern background.  (Doc. 29-3 at 4, 48, 57 & 135).

none of these criteria.  Alkhatib has not offered any evidence from a custodian or any other person aware of how the survey responses were prepared, to what they referred, by whom they were made, or to what extent they were edited.  Alkhatib is also unable to offer any insight as to whether the declarants operated under a duty to report and whether their statements were based on personal knowledge.  Absent such a showing, the Court finds not only that Alkhatib has failed to establish a proper foundation for his proffered evidence but also that the survey responses are not adequately trustworthy to warrant their admission at trial or consideration on summary judgment.  See United States v. Henry, 307 F. App'x 331, 336 (11th Cir. 2009) ("The trustworthiness prong is not met when the party authenticating the records can provide no testimony regarding the origination and compilation of the documents or about the initial link in the chain producing the record." (citation and quotation marks omitted)).[9]

But even if the survey responses were excepted from the hearsay rule, and even if Alkhatib could establish their relevance notwithstanding that the comments were made at least a year after the events at issue in this case and fail to mention anything about Alkhatib, his resignation, or his relationship with Steadman, their admission would not give rise to an inference of intentional discrimination.  To the contrary, the record of this case suggests that Steadman did not discriminate against foreign-born professors generally or Alkhatib specifically.  Statistical evidence demonstrates Steadman's history of promoting and supporting foreign-born engineering faculty at USA,[10] and the

---

[9]    On hearsay grounds, but without referencing the business records exception expressly, other courts have also excluded anonymous survey responses like those replied upon by Alkhatib.  See, e.g., Olle v. Columbia Univ., 332 F. Supp. 2d 599, 614-15 (S.D.N.Y. 2004) (excluding in an employment discrimination case anonymous survey responses that were critical of plaintiff's employer), aff'd, 136 F. App'x 383, 384 (2d Cir. 2005) ("Olle also argues that an anonymous survey of prior fellows demonstrates pervasive bias. This survey is clearly inadmissible hearsay under the definition of Federal Rule of Evidence 801.").

[10]    Between 2003 when he became Dean and 2008 when Alkhatib resigned, Steadman oversaw the

factual background set forth above shows that Steadman approved pay raises for Alkhatib, recommended that Alkhatib be promoted and receive tenure, and offered to write Alkhatib a letter of recommendation to assist him in finding other employment. (Doc. 29-3 at 17-18, 92-97, & 116; Doc. 29-6 at 3, ¶ 5). To the extent that the pieces of the record come together to create a mosaic in this case, the image is one of a college administrator whose decisions, though perhaps lacking in sympathy for the plaintiff, were not motivated by discriminatory animus.

## V.    Conclusion

In accordance with the foregoing, it is **ORDERED** that Defendants' Motion for Summary Judgment (Doc. 29) is **GRANTED**.

As provided in Rule 58 of the Federal Rules of Civil Procedure, Judgment shall be entered by separate document.

**DONE** and **ORDERED** this the **15**[th] day of **November 2011.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

hiring of 14 tenure-track faculty members, the majority of whom were foreign-born. (Doc. 29-6 at 4, ¶ 9). During that same period, all four of the professors to receive tenure in the College of Engineering were foreign-born. (Id.; id. at 7). Additionally, five of the seven professors for whom Steadman personally recommended special merit-related raises in 2005, 2006, and 2007 were foreign-born. (Id. at 4-5, ¶ 10; id. at 9-14).